**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND, NORTHERN DIVISION**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| v. | | Case No. ELH-14-0414 |
| | * | |
| **BARAKA CHAUKA** | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT'S REPLY TO THE GOVERNMENT'S
CONSOLIDATED RESPONSE TO DEFENDANT'S MOTIONS TO SUPPRESS**

Defendant, Baraka Chauka, through his counsel, Jonathan P. Van Hoven, hereby replies to the Government's consolidated response to his pretrial motions to suppress all evidence in this case. For reasons stated herein , as well as in his original motions and any arguments to be made at the hearing on this matter, the Defendant respectfully submits that the Government has failed to justify the actions of law enforcement in intercepting the electronic communications that it intends to use in this case, as well searching his vehicle and person during an unlawful car stop on April 21, 2014. All evidence, including derivative evidence obtained as a result of these unlawful actions, should be suppressed.

**A.  The Defendant's Motion To Suppress The Wiretap Evidence Should Be Granted.**

**1.  The Defendant clearly has standing as an aggrieved party to challenge the issuance of a Title III order if his conversations were intercepted.**

Inexplicably, the Government made a preliminary assertion in its Response that the Defendant somehow lacks standing "to the extent those calls did not intercept any call involving him as an interceptee" [Gov. Resp. P. 17]. The Government is confusing the concepts of standing to assert an overall right to object to the issuance of a wiretap order with the separate

1

argument of whether the calls were properly minimized.  The Defendant need not repeat the authority cited in his original motion that supports his right to challenge the legality of the Title III orders.  The Government cites one case, *United States v. Pine*, 473 F.Supp. 349 (D.Md. 1978), in support of its wholesale claim that the Defendant lacks standing to challenge the issuance of the orders in this case because he was not a party to certain pertinent calls that it intends to use against him.  The Court in *Pine* made reference to the standing issue with regard to whether certain calls were properly <u>minimized</u>.  *Id.* at 353.  The Court did not suggest, nor is there any authority, that one does not have standing to challenge the overall validity of a Title III wiretap in which he is an aggrieved person, just because he is not in <u>all</u> of the calls.

   **2.  The wiretap orders should not have been continued, nor should additional lines have been intercepted, because it was clear that the main objectives of the investigation were not in fact actually being pursued.**

  If the original objective of the wiretap was to find the sources outside of Reed's area of sale, such as his supplier in Delaware, there was no reason to continue to extend the orders to additional lines, and in particular, the D and E lines.  The Government cited calls wherein it theorizes that when co-defendant Reed was unable to procure his drugs from his normal large sources out of state, namely the person whom investigators were allegedly trying to identify, Reed briefly turned to the Defendant to buy two "eightball" quantities to hold him over.  As one can see in the affidavit, with little more than that proffer, the authorities sought and received permission to intercept the D line.  *See* Document 39-11, Pages 20-23.

  Similarly, when agents monitoring the D and E lines suspected that the Defendant was himself traveling out of state to Delaware to procure drugs, it appears, based on the discovery provided, there was no significant effort to actually try to first determine if his travels were for a

legitimate purpose, such as his known employment as a truck driver in Delaware or secondly, identify these alleged regular sources of supply for Reed's so-called organization. Instead, the entire investigation simply focused on suspicions of local low level dealing on the parts of Reed and the Defendant rather than what should have been their true goals of their original investigation: identifying and prosecuting larger sources of supply.

Going back to the original affidavit in support of the A Line, agents, as is the usual case in these matters, made it clear in their boilerplate recitation that their number one reason for obtaining intercepts of Reed's phones was to prosecute the "principal targets" of the Reed organization. [Document 39-2, Page 13]. Yet when agents asked for permission to intercept the D and E Lines, it was clear that the alleged relationship, if any, between Reed and the Defendant was so limited that Reed needed to actually introduce himself before asking to buy the small quantity of drugs he was temporally seeking to hold him over. Such a tenuous relationship should not be the grounds for seeking intrusive Title III interceptions.

Moreover, when agents, using GPS tracking technology pursuant to a subsequent warrant request (*see* Exhibit 1), later believed that the Defendant was traveling to Philadelphia to purchase drugs, there appears to have been no effort to actually identify that alleged source of supply. It is also noteworthy that in this affidavit, agents claim that they have been investigating the Defendant for 14 years as a known large or mid-level drug dealer in this very small, rural area, and presumably would be one of the known associates of co-defendant Reed. However, the Defendant is not mentioned at all in the original Title III affidavits.

This inaction on the part of law enforcement further supports Defendant's position that the authorities never really intended to identify the Defendant's alleged sources of supply, even

though that was supposed to be the primary goal of the Title III investigation.

**3. The investigators did not comply with the exhaustion provision required by the requisite state and federal statutes.**

The discovery provided to date and submitted as exhibits in the Government's response completely belies the argument that more traditional methods of investigation could not have achieved the stated goals of the affiants.  The Government has already turned over several hundred pages of documents replete with examples of the authorities easily obtaining incriminating evidence against Reed without a Title III order.  The agents successfully engaged in extensive physical surveillance, were able to take hundreds of photographs, executed search and seizure warrants, arrested buyers without alerting alleged suppliers, tracked people's movements with GPS tracking devices, and seized drugs on numerous occasions.  These techniques were employed both before and during the time period of the Title III intercepts. Law enforcement essentially did all of the things that they stated in boilerplate fashion they could not do in this case.  In fact, the Government states in defense of the warrantless search of the Defendant on April 21 that they were able to develop independent probable cause to do so.  While the Defendant will further address that particular issue below, it bears noting here that all of these activities stated above support the Defendant's position that agents always knew that a Title III intercept was completely unnecessary in this case.

A further example of this can be found in the body of the affidavit for the first search warrant for the home where he resided, which was not submitted by the Government in its response, attached herein as Exhibit 2.  In this affidavit, agents freely disclosed details about the ongoing investigation of the Defendant, including their claim that they had been conducting intense surveillance of individuals leaving his home, with at least one vehicle being searched and

drugs recovered therein. On the one hand, government agents stated that they were concerned that disclosing the existence of search warrants or surveillance would jeopardize the investigation. On the other hand, they did in fact disclose such matters without jeopardizing the investigation. Thus, contrary to what was stated in the Title III affidavits, their actions in this case call their sworn affidavit statements into question.

Another example of the agents' failure to exhaust other investigative techniques is with regard to their repeated recitation in the affidavits that due to the rural nature of the area, normal surveillance techniques were more difficult or impossible. First, agents gave no details about any actual attempts to follow the Defendant. Nor are any references to the alleged attempts at surveillance found in the myriad investigative reports supplied by the Government in discovery. Second, as evidenced in the discovery, agents conducted surveillance of other individuals throughout this investigation. Third, there is nothing about the geography of this area of Maryland that precludes conventional investigative techniques, as evidenced with the actions of the agents in this case.

**4. The *Leon* good faith exception should not apply in this case.**

The Government argues in the alternative that even if the warrants were deficient, the evidence should not be excluded based on the principles of *Untied States v. Leon*, 468 U.S. 897, 922 (1984). To the contrary, the actions of law enforcement would not give government agents protection under by the good faith exception. As the Supreme Court stated in *Leon*:

> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned *in Lo–Ji*

*Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979); in such circumstances, no reasonably well trained officer should rely on the warrant. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown v. Illinois*, 422 U.S., at 610–611, 95 S.Ct., at 2265–2266 (POWELL, J., concurring in part); *see Illinois v. Gates, supra*, 462 U.S., at 263–264, 103 S.Ct., at 2345–2346 (WHITE, J., concurring in the judgment). Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid. *Cf. Massachusetts v. Sheppard*, 468 U.S., at 988–991, 104 S.Ct., at 3428–3430.

*Id. at 923.* Based upon the agents' averment to Circuit Court for Queen Anne's County, compared to how they were actually able to conduct their investigation, the agents aren't afforded protection under *Leon.* The affidavits contain the usual language such as the recitations of exhaustion of other techniques, but this language is not supported by the actual events that transpired during this investigation.

The affidavits in this case are more akin to what the 4th Circuit was faced with in *United States v. Wilhelm*, 80 F.3d 116 (4th Cir. 1996). There, the Court found *Leon* inapplicable, stating: "We find that the good-faith exception to the exclusionary rule should not apply in this case due to the "bare bones" nature of the affidavit, and because the state magistrate could not have acted as other than a "rubber stamp" in approving such an affidavit." *Id.* at 121-22. Here, little more than one set of phone calls, stated above, coupled with the Defendant's prior record, formed the basis of why agents felt justified in requesting authorization for the Title III interception of the D line and later, the E line. Such "bare bones" efforts on the part of law enforcement afford them no protection under *Leon.*

**B.      The Defendant's Motion to Suppress Evidence from the Traffic Stop Should be Granted**

The Defendant does not accept the proffer of facts in support of the Government's position as to what actually transpired during the traffic stop. Since the stop was warrantless, this Court will be better able to make determinations as to whether there was probable cause only after it hears testimony on the matter. The Defendant, however, wishes to make clear that if this Court finds that the evidence derived from the Title III wiretaps should in fact be denied, then evidence from this stop cannot independently survive the exclusionary rule. The pretextual stop here was not supported by independent probable cause.

"Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 407; *Whren v. United States*, 517 U.S. 806, 810; *United States v. Foreman*, 369 F.3d 776, 781 (4th Cir. 2004). There may be justification for stopping a person for as long as it would have taken to perform the traditional incidents of a routine traffic stop. However, when "a police officer wants to detain a driver beyond the scope of a routine traffic stop[,] . . . he must possess a justification for doing so other than the initial traffic violation that prompted the stop in the first place", *Branch* at 336, or else he seizes the individual in violation of the Fourth Amendment. "Thus, a prolonged automobile stop requires either the driver's consent or a 'reasonable suspicion' that illegal activity is afoot." *Id.*

To justify a prolonged pretextual stop, a police officer must point to "specific and articulable facts which, taken together with rational inferences from those facts," *Terry* at 21, evince "more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity," *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (quoting *Terry*, 392 U.S. at 27 (internal quotations

7

omitted)). Thus, the quantum of proof necessary to demonstrate "reasonable suspicion" is "considerably less than [a] preponderance of the evidence." *Wardlow*, 528 U.S. at 123. In determining whether an officer had "reasonable suspicion" to prolong a traffic stop, courts take a holistic approach which takes into account the cumulative information available to the police officer. See *Branch* at 337. Additionally, the 4th Circuit disallows any attempts to "rely on post hoc rationalizations to validate those seizures that happen to turn up contraband." *United States v. Foster,* 634 F.3d 243, 249 (4th Cir. 2011). *See also United States v. Powell*, 666 F.3d 180, 183 (4th Cir. 2011) ("Today, we once again are presented with a case in which the Government has attempted to meet its burden under *Terry* by cobbling together a set of facts that falls short of establishing reasonable suspicion").

As the Government concedes, law enforcement had collect knowledge of the information uncovered during the wiretap investigation. Without question, that this stop was a planned, pretextual stop to determine whether the Defendant had suspected drugs on his person. Moreover, the Government cannot rely on the prior collective knowledge of the officers as a basis for the stop if that evidence was illegally obtained. *Wong Sun v. United States*, 371 U.S. 471 (1963).

What might survive after a *Wong Sun* analysis has yet to be determined by this Court. Until such time as the Government is able to overcome its burden at an evidentiary hearing on this matter, it is premature to rule on this issue.

Respectfully submitted,

/s/

Jonathan P. Van Hoven
One North Charles Street
Suite 1215
Baltimore, MD 21201
(410) 576-0689

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 17th Day of April, 2015, a copy of the foregoing *Reply* was filed via CM/ECF.

/s/

Jonathan P. Van Hoven